Filed 8/1/25  P. v. Johnson CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RONNIE EDWARD JOHNSON,<br><br>Defendant and Appellant. | B337321<br><br>(Los Angeles County Super. Ct. No. MA028813) |

APPEAL from an order of the Superior Court of Los Angeles County, Charlaine F. Olmedo, Judge.  Affirmed.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Idan Ivri, Supervising Deputy Attorneys General, for Plaintiff and Respondent.

Many years after his special circumstance murder conviction, defendant and appellant Ronnie Edward Johnson (defendant) filed a Penal Code section 1172.6 (former Penal Code section 1170.95) petition for resentencing.[1]  Before holding an evidentiary hearing, the trial court denied his request to appoint an expert to testify regarding potential contamination of DNA samples.  We consider whether this was error and whether reversal is required because the trial court may have considered, in denying defendant's petition, a prior appellate opinion's summary of certain evidence at trial.

## I.  BACKGROUND

### A.    *The Offense Conduct and Police Investigation*

Charles Trice (Charles) was 72 years old in 2003.  He lived in Littlerock, California.  His daughter, Patricia Trice (Patricia), came to his home to visit one evening in October 2003, but Charles's car was not there and the gates were open, so Patricia assumed he had gone out.  Patricia left to spend the night with her mother, who lived nearby.

When Patricia returned to Charles's house the next morning, his car still was not there and she noticed his television was on "extremely loud."  She looked inside and saw Charles lying on the floor with duct tape around his ankles and wrists.  She called 911.  Los Angeles County Sheriff's Deputy Richard Engels arrived and discovered Charles was dead.

Sergeant Shannon Laren of the Los Angeles County Sheriff's Department was assigned to investigate the case.

---

[1]    Undesignated statutory references that follow are to the Penal Code.

2

There were no signs of forced entry. Sergeant Laren observed bloody footprints and a plastic bag with blood on it near Charles's body. One of the rear pockets on Charles's pants, where Patricia testified Charles normally carried a wallet, had been torn off.

Charles's car was found in the "open desert." Part of the front passenger seat was burned. Defendant lived about a mile from the site where the car was found.

A deputy medical examiner from the Los Angeles County Coroner's Office, Dr. Jeffrey Gutstadt, concluded Charles suffered blunt force traumatic injury to his head consistent with being struck with the butt of a handgun. Among other things, Charles also suffered injuries to his neck "consistent with enough pressure being applied to the neck to cause death." Dr. Gutstadt opined that Charles died of asphyxia due to the neck compression with blunt force trauma to the head as a contributing factor.

A couple months after the murder, defendant drove to Big Bear with Jesse Scott (Jesse). According to Jesse, defendant confided in him during this trip that defendant and Jesse's brother, Ernest Scott (Ernest), were at Charles's home on the night of his murder. Defendant told Jesse the murder was a "contract killing" arranged by a man named Shane to obtain life insurance proceeds.[2] Defendant said that he and Ernest knocked on Charles's door ostensibly to buy marijuana, defendant hit Charles multiple times, defendant or Ernest put duct tape over Charles's mouth to stop him from making noise, and at some point, Ernest told defendant they should kill Charles because he

---

[2]     Jesse testified Shane was Charles's son or step-son. Patricia testified she has no biological siblings and Charles did not consider Shane a son.

could identify them.  Defendant also told Jesse that he and Ernest took marijuana and a gun from Charles's house.  A few months later, after an armed person climbed onto the roof of the home Jesse shared with other family members, Jesse called Sergeant Laren and revealed this conversation he and defendant had on the way to Big Bear (the sergeant recorded the phone call).[3]

Anton James (Anton), who was married to Ernest's sister, had been in a car with defendant and Ernest about a week before Charles was killed.  While in the car together, Anton heard defendant and Ernest talking about robbing Charles.[4]  Around the same time, defendant and Ernest asked to borrow a roll of duct tape from Anton's father, Hassen James (Hassen).  He gave them the duct tape, but they did not return it.

### B.    Criminal Proceedings and Further Investigation

Investigators searched defendant's home after he was arrested for Charles's murder.  No physical evidence linking defendant to the crime was found.

---

[3]    Jesse testified at defendant's later criminal trial, and his testimony was consistent in most respects with what he said during the earlier recorded phone call.  There were some inconsistencies, however, including about what defendant and Ernest took from Charles's house and who first suggested killing Charles.

[4]    Anton's mother, Diane White, was the subject of a search warrant.  One of the issues defendant raised on direct appeal was the trial court's preclusion of evidence tending to show her involvement in Charles's murder.  (*People v. Johnson* (July 10, 2008, B197179) [nonpub. opn.].)

4

Criminalist Kari Yoshida (Yoshida) compared DNA found on the duct tape used to bind Charles to DNA obtained from defendant. The DNA profiles were a probabilistic match. As we later discuss in more detail, however, Yoshida was cross-examined at trial regarding potential contamination of the DNA samples.

After defendant's preliminary hearing in November 2004, Sergeant Laren arranged for him to be seated on a bench next to Ernest with a recording device hidden nearby. (Ernest was tried separately.) A recording of the conversation between defendant and Ernest was played at trial.[5] Defendant asked Ernest whether Jesse planned to testify at trial, and Ernest said his private investigator believed Jesse wanted "nothin[g] to do with it." Defendant said he was "gonna be real with" Ernest and told him that when he "and [Jesse] went to Big Bear, [defendant] mentioned somethin' about that, but [he] didn't mention nothin' about [Ernest]." Defendant later told Ernest that if "by some kind of miracle" defendant "g[o]t outta this," "[a]ll hell gonna break . . . loose." He said there was someone in court "to see who got on the stand" and that person was "just waitin' on [defendant] to give a word."

---

[5] The Attorney General's request for judicial notice of the transcripts of this recording and Jesse's call to Sergeant Laren, People's Exhibit Nos. 47 and 49, is granted. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)) On our own motion, we take judicial notice of the redacted audio recordings, People's Exhibit Nos. 48 and 50, that were played at trial.

Before defendant's jury trial, and following an in camera discussion with defense counsel, the trial court ordered the prosecution to "turn over to the defense the lab error rates that have been kept in connection with Kari Yoshida from the time of her employment with the Sheriff's Department . . . ." The prosecution clarified the trial court was referring to what the prosecution called "unexpected results." Defendant's attorney acknowledged the prosecution had already produced "all the validation studies regarding the Sheriff's lab as far as the certification of the lab and as far as the policies and procedures that are set in place to [e]nsure that there is no contamination of any DNA results." The prosecution disclosed two unexpected results involving Yoshida since she started working in the Sheriff's lab, but the trial court ultimately excluded these as irrelevant.

In the course of her trial testimony regarding her analysis of the duct tape samples, Yoshida testified that the pieces of duct tape used on Charles's ankles and wrists were stored in separate boxes. She sent these samples to another part of the laboratory to be dusted for fingerprints before she checked for DNA, and the boxes were switched when the samples came back to her. Yoshida documented this in her report, but she testified it did not interfere with her testing. And though Yoshida acknowledged the mix-up could have resulted in contamination, DNA would only have been transferred from one piece of duct tape found at the crime scene to another. There was no indication that the fingerprint analyst who switched the boxes had any contact with the reference samples of defendant's DNA. Nonetheless, Yoshida acknowledged Sergeant Laren was "very disappointed" when she told him about the error.

6

Yoshida also testified she would have preferred to swab the duct tape for DNA while other members of the laboratory looked for fingerprints because, among other things, dusting for prints could move DNA from one part of the tape to another. However, it was "common practice for chemical to do their fingerprint analysis before [Yoshida and her colleagues] g[o]t [a sample]."

Yoshida additionally testified she tested samples from the crime scene at the same time that she tested reference samples containing defendant's DNA, though she took care not to have more than one test tube open at a time. Yoshida acknowledged this practice was not consistent with protocols established by the manufacturer of one of the kits used in the DNA extraction. The manufacturer and other authorities instead recommended evidence samples and reference samples be extracted at separate times to reduce the risk of cross-contamination, and Yoshida testified this was a "good recommendation" that her laboratory later adopted. Yoshida testified, however, that she extracted DNA in this case consistent with her laboratory's protocols in 2005, which were in line with standards established by the FBI and a professional association.

### C. Conviction and Sentencing

As relevant for our purposes, defendant and Ernest were charged with murder; associated robbery-murder and burglary-murder special circumstances were alleged. (§§ 187, subd. (a), 190.2, subd. (a)(17).) Defendant's trial jury was instructed, among other things, on felony murder liability. The jury found defendant guilty of first degree murder and found true the robbery-murder and burglary-murder special circumstances. The trial court sentenced defendant to life in prison without the

7

possibility of parole and the judgment was affirmed on appeal. (*People v. Johnson* (July 10, 2008, B197179) [nonpub. opn.] (*Johnson I*).)

### D. Petition for Resentencing

Defendant filed a petition for resentencing in 2019. The trial court denied the petition without an evidentiary hearing in 2021, reasoning the special circumstance findings made him ineligible for relief as a matter of law and, in the alternative, defendant was one of the actual killers or a direct aider and abettor. This court reversed because the jury's special circumstance findings were made before our Supreme Court clarified the meaning of "major participant" and "reckless indifference to human life" in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 and because weighing of the evidence is not permitted at the prima facie stage. (*People v. Johnson* (Feb. 7, 2022, B310328) [nonpub. opn.].) The trial court was directed to issue an order to show cause and hold an evidentiary hearing on remand. (*Ibid.*)

Prior to the evidentiary hearing, defendant filed a discovery motion requesting, among other things, Yoshida's "[d]esk [n]otes/[l]ab [n]otes," including proficiency testing and quality control reports, protocols and manuals, and data "necessary to recreate the . . . analysis." The trial court directed the parties to informally work with each other regarding discovery, and defendant subsequently applied to the trial court to appoint a DNA expert "to review . . . Yoshida's desk notes and conclusions." Defendant explained "the appointment would be limited to a review of the protocol used by both . . . Yoshida and the fingerprinting expert. That is, contamination of the tape by

8

removing the tape from each box . . . since the tapes were switched . . . upon the return for DNA testing after the fingerprinting." Defendant emphasized he did not seek to "re-test[ ]" the duct tape, but rather to present evidence regarding "the weight" Yoshida's analysis "should be given (if any) due to the testing protocol itself." The trial court denied defendant's request to appoint a DNA expert.[6]

Defendant submitted a "trial brief" in advance of the evidentiary hearing, summarizing the testimony at defendant's criminal trial and noting, among other things, that the audio recording of the conversation between defendant and Ernest "was not turned over to the defense" and "[c]ounsel was told that this CD could not be found."

At the evidentiary hearing, the trial court stated it had "read the entire record of conviction." The trial court "[r]eceived into [e]vidence" a compact disc from the prosecution, which

---

[6]    The trial court did not set forth its reasoning in the denial order, but it had explained its thinking at an earlier hearing, remarking: "I'm not appointing a DNA expert. This is not a do-over for trial, and you're not here to prove [defendant's] innocence or whether or not there is newly discovered evidence or anything like that. [¶] If you want to go that route, you can file a habeas. The only thing at issue for an 1172.6 is—it's already assumed your client is guilty as far as being the one involved in the crime. The only issue for an 1172.6 . . . is whether or not he could still be convicted under a viable theory of murder liability. [¶] So the only question is: What is his intent or were his actions as an aider and abettor, not whether or not he was present at the scene. That is presumed. [¶] So we're not doing a do-over, and I'm not appointing experts that aren't solely focused on the issue which is before this court in an 1172.6."

9

included the clerk's transcript and reporter's transcript from defendant's trial, plus the *Johnson I* opinion. It did not include the recording of Jesse's call to Sergeant Laren or defendant's conversation with Ernest. Neither the prosecution nor defendant presented any new evidence at the evidentiary hearing.

The trial court denied defendant's petition for resentencing. In making factual findings at the hearing, the court referred—without objection—to Jesse's recorded statements to Sergeant Laren and defendant's statements to Ernest. In its written order denying the petition, the trial court concluded "the People proved, beyond a reasonable doubt, that defendant was one of the actual killers who, by his own words, was responsible for the blunt force trauma to the victim's head, which was a contributing factor in the victim's death. Alternatively, . . . defendant was a direct aider and abettor who harbored express malice. Lastly and also alternatively, . . . defendant was a major participant who acted with reckless indifference to human life."

## II. DISCUSSION

Defendant contends that because the prosecution did not introduce in evidence the recording of Jesse's call to Sergeant Laren and defendant's recorded hallway conversation with Ernest, the trial court must have improperly relied on the Court of Appeal's summary of these statements in *Johnson I*. The trial court was entitled to rely on these trial exhibits, however, without formally re-admitting or taking judicial notice of them. And even if we assume the trial court instead relied on the factual summary in *Johnson I*, any error is harmless because the summary in that opinion fairly reflects the substance of the recorded statements.

10

Defendant further contends the trial court abused its discretion in declining to appoint an expert to review the DNA evidence.  Any error, however, was harmless in light of the strength of the (other) evidence against defendant.

### A.    The Trial Court's Discussion of Recorded Statements Admitted at Trial Does Not Warrant Reversal

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019.  The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion."  (§ 1172.6, subd. (d)(3).)

Defendant contends that because the prosecution did not move into evidence the recordings of Jesse's call to Sergeant Laren or defendant's conversation with Ernest at the evidentiary hearing, the trial court "apparently" "fill[ed] in gaps in the evidence . . . by relying on the factual summary" in *Johnson I*. Assuming for argument's sake that defendant did not forfeit the issue by failing to object to the trial court's factual findings, the argument still lacks merit and any error was harmless in any event.

Section 1172.6 does not require the prosecution to present or the trial court to re-admit or take judicial notice of trial

11

exhibits at the evidentiary hearing. To the contrary, "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law . . . ." (§ 1172.6, subd. (d)(3).) Defendant's observation that the statute includes the phrases "[a]t the hearing" and "in the hearing"—supposedly demonstrating the trial court may only consider evidence presented at the hearing—disregards the context in which those phrases are used that shows neither pertains to consideration of exhibits previously admitted. Instead, the former refers to the prosecution's burden of proof ("*At the hearing* to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution") and the latter refers to new evidence ("The admission of evidence *in the hearing* shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law"). (§ 1172.6, subd. (d)(3), emphasis added.)

Defendant argues that even if the trial court was authorized to consider trial exhibits without re-admitting or taking judicial notice of them, it did not actually consider the recordings because they were not physically available. Defendant emphasizes his attorney notified the trial court the prosecution could not find the recording of the conversation between defendant and Ernest. Both this recording and the recording of Jesse's call to Sergeant Laren were, however, in the court's file (as established by the materials now before us). There is accordingly no basis to assume the trial court improperly relied on *Johnson I*'s summary when the recordings were available.[7]

---

[7] Although the trial court stated it "read" the record of conviction, defendant does not challenge the trial court's

12

But even if we assume the trial court improperly relied on *Johnson I*'s summary of the recorded statements, any error would still be harmless. A reviewing court confronted similar circumstances in *People v. Vance* (2023) 94 Cal.App.5th 706, which also involved a challenge to the denial of a section 1172.6 petition based on the trial court's reliance on a prior appellate opinion—though the trial court in that case expressly stated it was relying on the prior appellate opinion. (*Id.* at 711-713.) The *Vance* court emphasized the defendant "never claimed that [the] opinion misrepresented or omitted any material part of the record." (*Id.* at 714.) The same is true here.

Defendant, though, contends harmless error analysis would be inappropriate because the lower court did not "conduct[ ] the review required by the statute at the evidentiary hearing." Defendant relies on *People v. Gallardo* (2024) 105 Cal.App.5th 296, in which the trial court summarily denied a section 1172.6 petition for resentencing at the prima facie stage "following the prosecution's oral proffer that the jury instructions from [the defendant's] trial were based on a theory of direct aiding and abetting attempted murder." (*Id.* at 302.) The Court of Appeal "recognize[d] an order denying a section 1172.6 petition may be reviewable for harmless error," but it declined to "perform the trial court's statutorily mandated task for the first time on appeal" and substitute its judgment for that of the trial court. (*Id.* at 302-303.) Here, by contrast, even if we assume the trial court improperly relied on the summary of the recording in this

potential reliance on redacted transcripts which, though not included in the prosecution's submission, were also included in the trial court record.

13

court's prior opinion, our finding that the error was harmless does not involve any substitution of our judgment for that of the trial court as to defendant's eligibility for relief because the summary is undisputedly accurate.

> B.    *The Trial Court's Denial of Defendant's Request for Appointment of a DNA Expert Does Not Warrant Reversal*

Defendant contends that the trial court was authorized under Evidence Code section 730 to appoint an expert to review the protocols Yoshida followed in her DNA analysis and that its failure to do so was an abuse of discretion.[8] Assuming Evidence Code section 730 applies at an evidentiary hearing under section 1172.6, subdivision (d)(3), and further assuming the trial court did not act within its discretion in declining to appoint an expert to opine on an issue that was covered extensively in Yoshida's cross examination, there is still no prejudice.

Even if an expert had provided additional reasons to question Yoshida's determination that defendant left DNA on the

---

[8]    Evidence Code section 730 provides in pertinent part that, "[w]hen it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. The court may fix the compensation for these services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at the amount as seems reasonable to the court."

duct tape, it is not reasonably probable the trial court would have determined he is eligible for resentencing. The DNA evidence was a relatively small part of the strong evidence the trial court cited in support of its finding that defendant is guilty of murder under current law. We shall elaborate in context of two of the theories on which the trial court based its decision: that defendant directly aided and abetted murder with intent to kill and that he was a major participant in the robbery/burglary who acted with reckless indifference to human life. (§ 189, subds. (e)(2), (e)(3).)

Jesse's trial testimony and recorded call to Sergeant Laren establish defendant and Ernest went to Charles's home to kill him—or, in any case, they decided they had to kill Charles after they had bound and beaten him because he knew them, defendant personally beat Charles, he and Ernest were selected for the job because they were the only people "tough enough" to carry it out. Defendant was recorded acknowledging, in a general manner, that he made self-incriminating statements to Jesse. Anton and Hassen's testimony establish defendant and Ernest planned the robbery in advance and defendant obtained the duct tape used to restrain Charles. And the medical examiner's testimony establishes the murder was not the result of a single or sudden act.

Against this background, it is not reasonably probable the trial court would have deemed the DNA evidence necessary to find defendant ineligible for resentencing. Jesse's testimony, corroborated by defendant's recorded statement, establishes defendant and Ernest intended to kill Charles and (at a minimum) defendant aided and abetted Ernest in doing so. (*People v. Estrada* (2022) 77 Cal.App.5th 941, 945 [affirming

15

denial of petition for resentencing under former section 1170.95 because the record established the defendant was convicted of murder as an aider and abettor with intent to kill].)

The same evidence, combined with testimony from Anton, Hassen, and the medical examiner, establishes defendant was a major participant in the robbery/burglary who acted with reckless indifference to human life. Although the provenance of the gun used in this case is unclear, all of the other major participation factors (*People v. Strong* (2022) 13 Cal.5th 698, 705-706) weigh strongly in favor of defendant's status as a major participant. Defendant helped plan what he described as a "contract killing" that he and Ernest were engaged to perform, he personally beat Charles, he either made or carried out a suggestion to kill Charles in any case because he could identify them as his assailants, and he left Charles bound and dead or dying to be discovered the next morning. The same is true when it comes to reckless indifference to human life; the facts strongly establish the same regardless of the probative value of the DNA evidence. (*Id.* at 706; accord *People v. Emanuel* (2025) 17 Cal.5th 867, 884-885.) There was no effort to minimize the risk of violence—lethal violence was the express purpose of this "contract killing." Defendant was present at the scene of the killing, personally beat Charles, and, rather than restraining Ernest or aiding Charles, defendant either made or carried out the suggestion that he and Ernest kill Charles to prevent him from identifying them. In addition, although the precise duration of the attack is not known, it was sufficiently prolonged that Charles's yelling prompted defendant and Ernest to cover his mouth and turn up the television volume.

16

## DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

HOFFSTADT, P. J.

KIM (D.), J.

17